IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
ABERDEEN DIVISION

WILLIAM JODY CROMWELL

PLAINTIFF

v.                                      CIVIL ACTION NO. 1:20-CV-00174-GHD-DAS

BOA VIDA HOSPITAL OF ABERDEEN, MS LLC
d/b/a MONROE REGIONAL HOSPITAL

DEFENDANTS

### OPINION GRANTING DEFENDANT BOA VIDA HOSPITAL'S MOTION FOR SUMMARY JUDGEMENT

Presently before the Court is Defendant Boa Vida Hospital of Aberdeen, MS, LLC's Motion for Summary Judgment [23], in response to a claim against it of disability discrimination under Section 504 of the Rehabilitation Act of 1973, as presented by Plaintiff William Jody Cromwell in his Complaint [1]. Upon due consideration, for the reasons set forth herein, the Court hereby grants the Defendant's Motion.

### I. Factual Background and Procedural History

The Plaintiff is an adult resident of Monroe County, Mississippi [1 at ¶ 1]. Defendant Boa Vida Hospital of Aberdeen, MS, LLC ("Boa Vida Hospital"), doing business as Monroe Regional Hospital, is a Texas limited liability company that, at the times relevant for this proceeding, received federal funding through multiple government programs such as Medicare and Medicard [1 at ¶ 2]. The Plaintiff has worked as a certified registered nurse anesthetist ("CRNA") for many years in hospitals in Monroe County [1 at ¶ 4]. He worked as an independent contractor for the Defendant [1 at ¶ 5]. The Plaintiff has alleged that two of the Defendant's employees, surgery specialist Dr. Woodrow Brand III and Nurse Nancy Williams, complained about the Plaintiff to the Defendant's management team [1 at ¶¶ 6-7].

1

The Plaintiff was terminated through a January 5, 2018, letter sent by Chris Chandler, a nurse and administrator for the Defendant; Chandler acted on the order of Dr. Kinjot Singh, the owner and president of the Defendant [1 at ¶ 13; 1-2].

On August 15, 2018, the Plaintiff filed suit in state court against Williams and Brand for intentional interference with contract relations regarding the relationship between himself and the Defendant [24 at 8], alleging that "they maliciously interfered with his employment contract with Monroe Regional Hospital" [1-1 at 2]. The case was resolved on June 18, 2020, when the state court judge granted a Motion for Summary Judgment filed by Williams and Brand [1-1 at 5-6].

On August 14, 2020, the Plaintiff filed the Complaint *sub judice* [1]. In it, he alleges that he was terminated because of his disability and the perceptions that they created of an employee with said disabilities [1 at ¶¶ 8-9] and that "the individual animosity of Williams and Brand was also a part of the reason for Plaintiff's discharge" [1 at ¶ 11]. Likewise, he claims that he has "suffered mental anxiety and stress and lost income as a result of Defendant's actions" [1 at ¶ 15]. The Plaintiff brings his claim under the Rehabilitation Act of 1973 [1 at 1, citing 29 U.S.C. § 794(a)].

On September 17, 2020, the Defendant filed its Answer [5]. Following a period of discovery, the Defendant filed its Motion for Summary Judgment [23]. In its Memorandum in support of this Motion, the Defendant argues that the Plaintiff was terminated "[a]fter his intubation practices nearly cost a surgery patient her airway" [24 at 1]. These "intubation problems and other clinical issues created serious concern for patient safety" at the hospital, and the Plaintiff's "actions led to the hospital's decision to terminate his contract" [*Id.*]. As Chandler indicated in depositional testimony, "Brand, Williams, and other members of the surgery team

2

raised a number of concerns over the course of several years regarding [the Plaintiff's] ability to provide quality anesthesia services" [24 at 3; 23-5 at 4-6]. Chandler categorized these issues into groups based on four subject areas: ""insufficient anesthesia during some cases, difficult intubations, ignoring of alarms in surgery, [and] inability to stand during the cases" [*Id.* at 5]. Williams told Chandler about the Plaintiff's mobility issues in late 2015; Brand also indicated that he had complained years before this litigation began about the Plaintiff's difficulties with walking and standing during anesthesia cases [24 at 3; 23-3 at 5, 12; 23-6 at 3-4]. Brand also stated in his deposition that the Plaintiff "appeared to have trouble hearing alarms going off during surgery, which he emphasized happened frequently" [24 at 4; 23-3 at 5]. Williams likewise "testified that she received complaints from patients or their family members about [the Plaintiff's] inability to hear, and they questioned whether [the Plaintiff] was going to be responsible for putting them to sleep" [24 at 4; 23-6 at 6-7]. Another operating room nurse, Dana Thompson, stated that it appeared as though the Plaintiff was unable to hear alarms, and that she had to check on the patients to ensure their safety [24 at 4; 23-7 at 3-4]. Chandler himself testified that he had witnessed the Plaintiff's hearing issues [24 at 4; 23-5 at 10-11].

It is undisputed that the Plaintiff uses a walker due to knee pain [24 at 3; 23-1 at 18-22]. The Plaintiff has conceded that he has high frequency hearing loss in both years, but stated that he uses hearing aids [24 at 4; 23-1 at 15-16]. He also stated that the fans in the operating room interfered with his hearing, and "also conceded it was common knowledge among the operating room staff he had hearing problems" [24 at 4; 23-1 at 23]. Similarly, the Plaintiff admitted that nurses had confronted him about alarms going off, but he explained that he was just ignoring false alarms [24 at 4; 23-1 at 17-18].

3

The Defendant provided accommodations for the Plaintiff's health problems, including allowing him to remain seated while performing his duties for surgical cases and to use a walker [24 at 4]. The Defendant also stated that its team "dealt with" the Plaintiff's hearing issues through its accommodation efforts [*Id.*].

According to the Defendant, the Plaintiff's health problems eventually led to problems with his service as an anesthetist. Chandler testified that Brand complained to him three or four times about the Plaintiff and issues with "insufficient anesthesia" [24 at 5; 23-5 at 5]. However, according to the Defendant, the most serious problem related to the Plaintiff involved his intubations [24 at 5]. Brand, Williams, and Thompson all witnessed the Plaintiff intubate patients with what they considered to be a "rough and bloody procedure[]" [*Id.*]. Thompson testified "that nasal and oral intubations seemed more difficult for [the Plaintiff] than other CRNAs and resulted in so much blood loss, patients' oxygen saturation rates would drop low" [*Id*; 23-7 at 5]. These issues reached a crescendo in November 2017 when a surgery on a patient with a facial deformity required the Plaintiff to use a laryngeal mask airway (LMA) to control the patient's airway [24 at 5; 23-3 at 8-10]. At one point, the Plaintiff had removed the LMA in a failed attempt to intubate the patient; Brand eventually stepped in and replaced the LMA on the patient [*Id.*]. After Brand completed the surgery, the patient was moved to a recovery room, where the Plaintiff had once again removed the LMA and failed to intubate the patient [*Id.*]. This failure endangered the patient by causing significant bleeding, to the point that the patient's airway could have been lost [*Id.*]. Brand also stated that the Plaintiff's failure to discuss the second intubation with him demonstrated the Plaintiff's inability to communicate effectively with him; Brand indicated that this was not an isolated incident in this regard [Id.]. Similarly, the Plaintiff spoke with the patient's family about the incident; according to Williams and

4

Thompson, Brand as the treating physician should have had this conversation, not the Plaintiff [24 at 6].

Chandler subsequently launched an investigation into the incident, and spoke with members of the surgical team, including the Plaintiff, about it [24 at 6; 23-5 at 6-10]. This investigation broadened into a fuller investigation of the Plaintiff beyond his actions on the day in question [*Id.*]. Chandler concluded that the Plaintiff's intubation difficulties were a problem, and that he had overstepped his bounds by having conversations with the patient's family about next steps for patient care [*Id.*; 23-5 at 15]. After concluding his investigation, Chandler discussed the Plaintiff with Singh, the president and owner of the Defendant [24 at 7]. He recommended to Singh that the Defendant terminate the Plaintiff [*Id.*; 23-5 at 13]. Singh then contacted Brand to ask his opinion about the Plaintiff [24 at 7]. While Brand did not recommend the Plaintiff's termination, Singh nevertheless decided to terminate the Plaintiff [*Id.*]. The process ended in a meeting on January 5, 2018, between Chandler and the Plaintiff in which the former gave the latter a written termination notice [*Id.*; 23-9]. Thus, to reiterate, the Defendant argues that it terminated the Plaintiff because of his poor performance and for acting outside of his role as a CRNA by speaking to a patient's family.

On August 20, 2021, the Plaintiff filed his Response in Opposition to Defendant's Motion for Summary Judgment [29] and its corresponding Brief in Opposition to Defendant's Motion for Summary Judgment [30]. In said Brief, the Plaintiff alleges that Chandler told the Plaintiff that the termination "was not his doing, 'but Nancy [Williams] and Dr. Brand had come up there and talked to him'" and that "Williams and Brand had told him that 'there needed to be a change in the anesthesia department'" [30 at 8; 30-1 at 84-85]. According to the Plaintiff, Chandler then "changed his story" regarding the Plaintiff's termination by testifying during his

5

deposition that the termination decision was a collective decision between Chandler, Brand, and Singh [30 at 8-9; 29-9 at 7]. The Plaintiff further argues that his termination stemmed from Brand's opinion that the Plaintiff's difficulties walking and hearing created a "perception that the patients would have" about the Plaintiff that would not "reflect well" [30 at 9; 29-2 at 6]. The Plaintiff also notes that no cause was officially given for his termination [30 at 10]. Likewise, he notes that Chandler admitted in his deposition that the hospital did not receive any complaints about the Plaintiff from the patients or their families, and has no written complaints about him from other hospital staff [*Id.*; 29-9 at 6-7]. The Plaintiff also points to the depositional testimony of Dr. Joseph Ruder, a dentist at the hospital who also worked with the Plaintiff, who said that he had no issues with the Plainttif [30 at 12; 29-14 at 4]. The Plaintiff claims that Singh told Ruder that the Plaintiff resigned due to medical reasons [30 at 13] but presents no evidence to support this assertion, and so it must be discarded as hearsay. The same is true of a text message from Ruder's wife to the Plaintiff in which Ms. Ruder describes an alleged conversation between Ruder and Singh [*Id.*].

On September 24, 2021, the Defendant filed its Reply in Support of Defendant's Motion for Summary Judgment [35]. In it, the Defendant counters the Plaintiff's point regarding Brand's statement related to the "perception" of the Plaintiff [35 at 2]. The Defendant notes that Brand spoke to hospital management about the Plaintiff five times in two years [*Id.*; 29-2 at 6], and the Plaintiff's cited comment regarding "perception" originated in the first of these conversations in November or December of 2015, two years prior to the Plaintiff's termination [*Id.* at 3, 6-7; 35 at 2]. In his deposition, Brand clarified that while he was initially concerned about image, his concerns escalated beyond this issue and turned to the Plaintiff's failure to provide sufficient anesthesia and subpar intubation practices [35 at 2-3; 29-2 at 4-5]. As the

Defendant correctly noted, the Plaintiff has not disputed the substantial facts regarding the November 2017 intubation incident, and merely claimed that it was a difficult procedure [35 at 3]. The Defendant makes a similar point regarding Williams, citing her depositional testimony in which she clarified that that her issues with the Plaintiff touched on his mobility and hearing problems but also included his poor intubation skills and "refusal to follow her directions as the head of the operating room for various reasons" [*Id.*]. Lastly, the Defendant noted that Singh relied on Brand's opinion when assessing the Plaintiff because he performed the most surgeries at the hospital and the other physicians and dentists like Dr. Ruder only used the surgery suite "sparingly" and used regional anesthesia when they do so [*Id.* at 4; 29-12 at 4].

The matter is now ready for review.

## II. Legal Standards

### A. Summary Judgment

Summary judgment is warranted "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Weaver v. CCA Indus., Inc.*, 529 F.3d 335, 339 (5th Cir. 2008). This rule "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a sufficient showing to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322. The party moving for summary judgment bears the burden of identifying its basis for the motion, and must point to specific parts of the record that support its contention of an absence of a genuine dispute of material fact. *Id.* at 323.

After the moving party does so, the burden shifts to the non-moving party, which must "go

beyond the pleadings and by ... affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324; *Littlefield v. Forney Indep. Sch. Dist.*, 268 F.3d 275, 282 (5th Cir. 2001); *Willis v. Roche Biomedical Labs., Inc.*, 61 F.3d 313, 315 (5th Cir. 1995). When there is a dispute about the facts, the Court must view the facts in the light most favorable to the non-moving party and likewise must draw reasonable inferences in that party's favor. *Scott v. Harris*, 550 U.S. 372, 378 (2007). "However, a nonmovant may not overcome the summary judgment standard with conclusional allegations, unsupported assertions, or presentation of only a scintilla of evidence." *McClure v. Boles*, 490 F.App'x 666, 667 (5th Cir. 2012) (per curiam) (citing *Hathaway v. Bazany*, 507 F.3d 312, 319 (5th Cir. 2007)).

Any claim that is not raised in a response to a defendant's motion for summary judgment is deemed to be waived. *Aldrup v. Caldera*, 274 F.3d 282, 288 (5th Cir. 2001). Moreover, "[w]hen evidence exists in the summary judgment record but the nonmovant fails even to refer to it in the response to the motion for summary judgment, that evidence is not properly before the district court." *Malacara v. Garber*, 353 F.3d 393, 405 (5th Cir. 2003) (citing *Ragas v. Tennessee Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998). "Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment." *Ragas*, 136 F.3d at 458. That said, summary judgment "must be used cautiously or it may lead to drastic and lethal results." *Murrell v. Bennett*, 615 F.2d 306, 309 (5th Cir. 1980). This is particularly true regarding cases of alleged employment discrimination. *See Thornbrough v. Columbus and Greenville Railroad Co.*, 760 F.2d 633, 640–41 (5th Cir. 1985).

## B. Disability Discrimination in Employment Decisions

The Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability ... shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a). "To establish a *prima facie* case of discrimination under the Rehabilitation Act, 'a plaintiff must prove that (1) she is an "individual with a disability"; (2) who is "otherwise qualified"; (3) who worked for a "program or activity receiving Federal financial assistance"; and (4) that she was discriminated against "solely by reason of her or his disability."'" *Houston v. Texas Dep't of Agriculture*, 17 F.4th 576, 585-86 (5th Cir. 2021) (citing *Hileman v. City of Dall.*, 115 F.3d 352, 353 (5th Cir. 1997)). "Under the Rehabilitation Act, an employer is liable only if the discrimination occurred 'solely by reason of her or his disability,' not when it is simply a 'motivating factor.'" *Id.* (citing *Soledad v. U.S. Dep't of Treasury*, 304 F.3d 500, 505 (5th Cir. 2002)).

Rehabilitation Act claims are analyzed under the burden-shifting framework described in *McDonnell Douglas Corp. v. Green*. *Cohen v. Univ. of Tex. Health Sci. Ctr.*, 557 Fed. App'x 273, 277 (5th Cir. 2014). Under this framework, after a plaintiff meets their initial burden to demonstrate a *prima facie* case of discrimination, the burden shifts to the defendant-employer to articulate a legitimate, non-discriminatory reason for their action against the plaintiff. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). However, "the inquiry does not end here." *Id.* at 804. The burden then shifts to the plaintiff, who must demonstrate that the defendant's stated reason was merely a pretext for discriminatory action. *Id.* In the absence of such a demonstration, the plaintiff's case must fail. *Id.* at 807. This same principle is true in cases of alleged failure to promote and wrongful termination based on discrimination. *See Texas*

9

*Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 252–54. "The burden of establishing a *prima facie* case of disparate treatment is not onerous… the *prima facie* case 'raises an inference of discrimination only because we presume these acts, if otherwise unexplained, are more likely than not based on the consideration of impermissible factors.'" *Id.* at 253–54 (quoting *Furnco Construction Corp. v. Waters*, 438 U.S. 567, 577 (1978)). After this stage, as indicated above, the burden shifts to the defendant, who must "rebut the presumption of discrimination by producing evidence" of a legitimate, non-discriminatory reason for their actions." *Id.* at 254. This is accomplished by raising a genuine issue of material fact regarding the plaintiff's case of alleged discrimination, and the defendant need not persuade the court of its motives at this juncture. *Id.* at 255. If the defendant does so, the plaintiff's *prima facie* presumption is rebutted, "and the factual inquiry proceeds to a new level of specificity." *Id.* At this stage, the plaintiff must demonstrate that the defendant's offered reason was not "the true reason" for their employment decision; this burden merges with the plaintiff's "ultimate burden of persuading the court that she has been the victim of intentional discrimination." *Id.* at 256. Specifically, the plaintiff can succeed at this stage "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Id.* (citing *McDonnell Douglas*, 411 U.S., at 804–805).

### III. Analysis and Application

As noted above, the relevant standard in this case is whether the Plaintiff can demonstrate that the Defendant's allegedly discriminatory actions occurred "*solely* by reason of her or his disability" (emphasis added). *See Soledad v. U.S. Dep't of Treasury*, 304 F.3d 500, 505 (5th Cir. 2002)). The Plaintiff in the case *sub judice* fails to meet this requirement. The Defendant has

shown through depositional testimony that its decision to terminate the Plaintiff was motivated by his professional performance as a CRNA, including his ignoring of alarms, struggles with intubation, and communication practices with both patients and staff [24 at 1; 23-5 at 5]. The Plaintiff did not provide any evidence to the contrary on these points. Instead, he argued that that the intubations cited by the Defendant were particularly difficult and that any alarms that he ignored were merely false alarms [24 at 4]. However, this argument does not help the Plaintiff, in that he has failed to show how particularly difficult intubations or answering false alarms fall outside of his job responsibilities or how he should not be accountable, to the point of termination, for his professional shortcomings in these matters. Likewise, the Plaintiff's depositional evidence as to employee staff that did not have a problem with him did not negate the testimony of those that did. Just because he is liked by one person does not mean he was liked by all, or that problems noted by one member of the hospital staff would not rise to the level of termination, even if other members of the staff did not notice them.

    Thus, the Plaintiff's case ends here, as he cannot meet the high bar required of him under the prevailing law in the Fifth Circuit by demonstrating that his termination was solely the result of his disability. However, even if this were not so, he would fail under the pretext analysis in the third step of the *McDonnell Douglas* framework. He has failed to present sufficient evidence to demonstrate that the Defendant's cited reason for termination—i.e. his subpar professional performance in areas unrelated to his physical health—was a pretext for disability discrimination. His strongest piece of evidence in this regard appears to be a statement made by Brand about the "perception" created by the Plaintiff's work at the hospital. However, this statement was made over two years prior to his termination, other issues arose during that time, and Brand himself did not recommend the Plaintiff's termination. These facts undercut the value

of this statement as evidence in the Plaintiff's favor. Thus, here too the Plaintiff falls short of the goal.

## IV. Conclusion

The Defendant has sufficiently supported his contention that there is no genuine issue of material fact in this case and that he is entitled to judgment as a matter of law. Thus, the burden shifts to the Plaintiff, who has failed to show that there is a genuine issue of material fact. More specifically, the Plaintiff has failed to demonstrate that his termination was solely the result of his disability. For the reasons stated above, Defendant Boa Vida Hospital of Aberdeen, MS, LLC's Motion for Summary Judgment [23] is GRANTED.

An order in accordance with this opinion shall issue this day.

THIS, the 3rd of February, 2022.

_____
SENIOR U.S. DISTRICT JUDGE